MONACO, J.
There were a lot of odd things that happened in this case, but in the final analysis, each was properly addressed by the trial judge, and none require a reversal. Ronald J. Coates appeals the judgment and sentence that resulted in his conviction of first degree premeditated murder and a sentence of life imprisonment. He seeks a new trial.
The testimony at the jury trial reflected that after a series of altercations with the victim, Jeremy Welch, Mr. Coates shot Mr. Welch in front of a number of witnesses. After the initial volley of gunfire, the victim fell to the ground on his face. Mr. Coates and his accomplice then approached the fallen Mr. Welch and continued to shoot until Mr. Welch died. An autopsy reflected that the victim had been shot ten times. Mr. Coates appeals a number of rulings made by the trial judge, only three of which merit discussion.
A. JURY QUESTIONING AND NOTE-TAKING.
Mr. Welch asserts as error the trial court’s decision to allow the jury to take notes during the trial and to ask questions of witnesses under controlled circumstances. Mr. Coates objected to each procedure both prior to trial and at the trial. We find no error.
The court authorized jurors to take notes, but advised the jury that their notes *225 could not leave the court room at any time, except that jurors would be permitted to take them into the deliberation room when they retired to consider their verdict. He told them as well that their notes would be collected at the conclusion of the trial and shredded, and that no one would read them. He reminded them that notes are intended as an aid to memory, but should not take precedence over their independent recollections of the evidence. Finally, he advised them that whether they elected to take notes was up to each juror individually, but that they should not be distracted from the evidence by taking notes. Mr. Coates objected to the procedure, however, because he argued, “that’s very confusing, distracting. They overemphasize notes over memory, et cetera.” We conclude that his objections to note-taking were, not well-founded.
The arguments for and against allowing jurors to take notes were summarized concisely in United States v. Maclean, 578 F.2d 64 (3d Cir.1978). The strongest arguments for note-taking are that it is a valuable tool for refreshing memory and helps jurors to concentrate on the proceedings. The arguments against include concerns that the best note-takers may dominate a jury, or that too much emphasis might be placed on notes. As the Maclean court pointed out, however, there is no particular need to decide whether the dangers of note-taking outweigh its benefits. It is enough to conclude that the benefits are substantial enough to allow judges to decide on a case-by-case basis whether to permit it.
Thus, whether to allow a jury to take notes and use them in deliberations is a question within the sound discretion of the trial court. See Kelley v. State, 486 So.2d 578, 588 (Fla.), cert. denied, 479 U.S. 871, 107 S.Ct. 244, 93 L.Ed.2d 169 (1986); see also United States v. Rhodes, 631 F.2d 43 (5th Cir.1980). Frankly, it is hard to understand why anyone would find note-taking by jurors to be offensive. Studies reflect that juries allowed to take notes are better informed about the evidence and the law to be applied, and that note-taking is not distracting or disruptive. J.D. Cowan, et al., What Lawyers Think of Jury Trial Innovations, 86 Judicature 192 (2003); R. Creswell, Georgia Courts In The 21st Century, 53 Mercer L.Rev. 1 (Fall 2001). Certainly trial judges routinely take notes during non-jury trials when the judge is the trier of fact, and for years jurors have routinely been allowed to take notes during eminent domain trials without evident adverse effect. Florida Eminent Domain Practice and Procedure (2000), Chapter 11, Jury Instructions, 11-7. Moreover, the legislature saw fit to adopt a statute calling for jurors to be allowed to take notes in civil trials that are likely to exceed five days, provided jurors were properly instructed on the use of notes. See § 40.50(2), Fla. Stat. (2002); see also Fla. Std. Jury Instr. (Civ.)1.8(a). We see no logical reason, therefore, why a trial court cannot exercise its sound discretion in extending the privilege of note-taking to juries in criminal trials.
In the present case the trial judge opted to allow the jury to take notes, and carefully and capably instructed it on the subject of note-taking. We perceive no abuse of discretion, and consequently no error in this regard.
Similarly, the court allowed the jury to ask questions of witnesses in a carefully controlled environment. The judge instructed the jurors to write any questions they might have with respect to a witness on a sheet of paper and to hand the document to the bailiff. Jurors were then asked to leave the courtroom while the judge reviewed the questions with the attorneys and ruled on any objections. *226 Thereafter, the jury was readmitted to the courtroom and the judge asked the question of the witness. Each attorney was then given the opportunity to ask follow-up questions.
Mr. Coates does not appear to object to any particular question that was asked. Rather, he argues that the court abused its discretion in allowing jury questioning at all. He asserts that the process of jury questioning compels jurors to become advocates, rather than neutral finders of fact. We again find no abuse of discretion.
We conclude instead that the benefits of allowing jury questioning of witnesses is substantial, and that a trial court may exercise its sound discretion in determining whether to use it in a particular case. Our supreme court has approved jury questioning of witnesses, so long as the judge controls the procedure. See Watson v. State, 651 So.2d 1159 (Fla.1994), cert. denied, 516 U.S. 852, 116 S.Ct. 151, 133 L.Ed.2d 96 (1995). While there have been some misgivings expressed, the district courts of appeal have likewise sanctioned controlled jury questioning. See Henderson v. State, 792 So.2d 641 (Fla. 1st DCA 2001); Patterson v. State, 725 So.2d 386 (Fla. 1st DCA 1998); Tanner v. State, 724 So.2d 156 (Fla. 1st DCA 1998); Bradford v. State, 722 So.2d 858 (Fla. 1st DCA 1998); Pierre v. State, 601 So.2d 1309 (Fla. 4th DCA 1992); Scheel v. State, 350 So.2d 1120 (Fla. 3d DCA 1977); see also § 40.50(2), Fla. Stat. (2002). Similarly, virtually all federal jurisdictions that have considered jury questioning have sanctioned it under proper controls. See United States v. Hernandez, 176 F.3d 719 (3d Cir.1999); Shackelford v. Champion, 156 F.3d 1244 (10th Cir.1998), cert. denied, 525 U.S. 1150, 119 S.Ct. 1050, 143 L.Ed.2d 56 (1999); United States v. Feinberg, 89 F.3d 333 (7th Cir.1996), cert. denied, 519 U.S. 1133, 117 S.Ct. 997, 136 L.Ed.2d 876 (1997); United States v. Sutton, 970 F.2d 1001 (1st Cir.1992); United States v. Land, 877 F.2d 17 (8th Cir.), cert. denied, 493 U.S. 894, 110 S.Ct. 243, 107 L.Ed.2d 194 (1989); United States v. Polowichak, 783 F.2d 410 (4th Cir.1986); United States v. Callahan, 588 F.2d 1078 (5th Cir.), cert. denied, 444 U.S. 826, 100 S.Ct. 49, 62 L.Ed.2d 33 (1979); United States v. Gonzales, 424 F.2d 1055 (9th Cir.1970). See, generally, Joshua H. Tucker, Comment, The Impartiality Question, Should Juror Witness Questioning Be Upheld, 25 Ham-line L.Rev. 517 (2002).
The procedure adopted by the trial court in the present case is essentially the one suggested by the Fourth District in Pierre v. State, 601 So.2d 1309 (Fla. 4th DCA 1992). While it may not be the only procedure that might be found acceptable, it is certainly one that assures careful control over the process. We accordingly find no abuse of discretion in its application during the trial of Mr. Coates.
B. MISSING EXHIBITS.
Mr. Coates’ defense was basically that he had been mistakenly identified as the person who shot the victim, Mr. Welch. After the jury was instructed and had deliberated for about 6 hours it asked to see certain photographic lineups that had been admitted into evidence and shown to the jury. Although the trial court and counsel thought that all of the trial exhibits had been sent back with the jury at the start of deliberations, they soon learned that the photo lineups and several other pieces of evidence had not been given to the jury.
Counsel for Mr. Coates eventually discovered that he had inadvertently placed the documents in his truck when his staff gathered up all of his trial materials at the conclusion of the trial. He apologized for his unintentional actions (which apologies *227 and explanations were accepted by the trial judge), but then moved for a mistrial because the jury did not have the exhibits during the whole of its deliberations. He argued that giving the jury the exhibits now would place undue emphasis on them. The court, however, noted that each of the missing exhibits had been published to the jury when they were admitted, and decided to give the exhibits to the jury after instructing them appropriately.
His instructions essentially told the jury that the exhibits had not gone to them at the outset of their deliberations because of human error, and that they were not to accord any additional weight to the exhibits solely because they were being given to them late. More specifically he told them:
With regard to these exhibits, do not place any special emphasis or undue weight. You are to weigh them just like you would any other evidence in this case.
Simply because they are tendered to you late, they’re still evidence like all of the other exhibits in evidence in the case. You are to rely on your own recollections of the evidence, and you are to rely upon the testimony and the evidence as it occurred here in the courtroom, and these exhibits that are tendered to you will be brought to you in the jury room.
Mr. Coates argues that section 90.106, Florida Statutes (2001), compelled the granting of a mistrial. That statute prohibits a judge from summing up evidence, or commenting to the jury on the weight of the evidence, the credibility of the witnesses, or the guilt of the accused. His theory is that by sending the evidentiary exhibits to the jury after the start of deliberations, coupled with instructions concerning their late delivery, the judge was commenting on the evidence by placing undue emphasis on these particular exhibits. We disagree.
While we have found no cases directly on point (and none have been called to our attention), some insight is offered by Griffin v. State, 414 So.2d 1025 (Fla.1982). In Griffin the defendant was being tried for felony murder, the underlying felony being robbery. Several hours after jury deliberations began, the trial court realized in responding to a jury question that it had failed to instruct the jury on the elements of robbery. The judge recalled the jury, read them the appropriate instruction, and allowed them to retire to deliberate. Among the arguments made by the defendant in his appeal was that the late instruction placed “undue emphasis” on the late-given instruction. The supreme court determined that the defense argument “is insufficient without more to show that the instruction placed an undue emphasis on the felony murder theory.” Griffin, 414 So.2d at 1028. See also Bottoson v. State, 443 So.2d 962 (Fla.1983), cert. denied, 469 U.S. 873, 105 S.Ct. 223, 83 L.Ed.2d 153 (1984).
The determination of whether substantial justice requires the granting of a mistrial is within the sound discretion of the trial court. See Sired v. State, 587 So.2d 450, 452 (Fla.1991), cert. denied, 503 U.S. 946, 112 S.Ct. 1500, 117 L.Ed.2d 639 (1992). Here, where the exhibits had already been published to the jury, and where the trial judge explained the mistake in not sending them to the jury earlier, and where he instructed that no special emphasis was to be placed on the late exhibits simply because they were coming to them late, we do not perceive that any undue emphasis was placed on the exhibits, and we find no abuse of discretion.
C. THE JURY ROOM EASEL.
Yet another bizarre event occurred in this trial. Apparently the jury asked for an easel to be brought into the jury *228 room for use during its deliberations. At the end of the first day of deliberations a bailiff inexplicably went into the jury room and removed the easel by carrying it through the courtroom. On the easel the jury had written the results of a preliminary vote: 7 guilty, 2 not guilty, 3 undecided. The results were apparently seen by counsel for both sides and members of the public.
Mr. Coates moved for a mistrial on the theory that the sanctity of the jury room had been invaded. The State responded that there was no jury misconduct, and no attorney misconduct, and that it was no more than an “inadvertent display of jury work product.” The court agreed with the State and denied the mistrial.
Once again, no cases have been brought to our attention that deal with this precise situation. Mr. Coates does cite three cases that concern circumstances where an interim jury vote was made known to the trial court preliminary to the giving of an Allen[1] charge. See Lebron v. State, 799 So.2d 997, 1013 (Fla.2001), cert. denied, 535 U.S. 1036, 122 S.Ct. 1794, 152 L.Ed.2d 652 (2002); Washington v. State, 758 So.2d 1148, 1153 (Fla. 4th DCA), rev. denied, 786 So.2d 1192 (Fla.2000); Scoggins v. State, 691 So.2d 1185, 1187-88 (Fla. 4th DCA 1997), approved, 726 So.2d 762 (Fla.1999). In those cases the appellate courts indeed referred to the “inherent harm” of having the jury reveal its interim position. The “harm” referenced, however, is not based simply on the giving of a “half-time score.” Rather, it is the potential coercive effect of having the jury reveal its deadlocked voting position prior to giving the Allen instruction that is the cause for concern. In this connection the Lebrón court said as follows:
We conclude that the potential for harm is inherent in an inquiry as to numerical division. The deliberations of a jury are extremely sensitive, and nothing should be done by the trial court to directly or indirectly influence a jury’s deliberations, especially in a way that might divide or cast one juror or group of jurors against the others.
Lebron at 1013.
In the present case there is nothing arising out of the removal of the easel that the court has done that might influence the jury’s deliberations. So far as we can tell from the record, the jury was completely unaware that their interim vote had been inadvertently made known.
In order to conclude that a new trial is warranted on this basis, Mr. Coates would have to demonstrate that the publication of the information on the easel somehow worked to his prejudice. Cf., Bottoson, 443 So.2d at 966 (To be entitled to a mistrial defendant would have to show that presence of unauthorized object in jury room somehow prejudiced him). He has not done so. Thus, while unfortunate, and certainly not to be encouraged, the display of the easel without more is not in the present ease a ground upon which we could reverse the judgment and sentence.
D. CONCLUSION.
Mr. Coates asserts a number of other errors purportedly made by the trial court. We find, however, that none of these arguments is meritorious. While several unusual occurrences punctuated the trial of Mr. Coates, we find no abuse of discretion on the part of the trial judge, and no other basis for reversal. Given the strong evidence of his guilt, and his spirited defense, *229 we are satisfied that Mr. Coates received a fundamentally fair trial. Accordingly, we affirm the judgment and sentence.
AFFIRMED.
GRIFFIN and THOMPSON, JJ., concur.

. Allen v. United States, 164 U.S. 492, 17 S.Ct. 154, 41 L.Ed. 528 (1896); Fla. Std. Jury Instr. (Crim) 3.06.